**Penske Media Corp. v Shutterstock, Inc.**

2025 NY Slip Op 31796(U)

May 15, 2025

Supreme Court, New York County

Docket Number: Index No. 652761/2024

Judge: Joel M. Cohen

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 03M

-----------------------------------------------------------------------------------X

PENSKE MEDIA CORPORATION

                            Plaintiff,

              - v -

SHUTTERSTOCK, INC.,

                        Defendant.

-----------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 652761/2024 |
| **MOTION DATE** | 11/06/2024, 01/08/2025 |
| **MOTION SEQ. NO.** | 002 003 |

**DECISION + ORDER ON MOTION**

HON. JOEL M. COHEN:

The following e-filed documents, listed by NYSCEF document number (Motion 002) 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 131, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 191, 192, 193, 194, 195

were read on this motion for              PARTIAL SUMMARY JUDGMENT .

The following e-filed documents, listed by NYSCEF document number (Motion 003) 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 67, 68, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190

were read on this motion for              PARTIAL SUMMARY JUDGMENT .

     This case involves a contractual arrangement predicated mainly on Plaintiff Penske Media Corporation ("PMC") giving Defendant Shutterstock, Inc. ("Shutterstock") access to take photographs at exclusive, high-profile live events, such as the Academy Awards and Tony Awards ceremonies.  In exchange, Shutterstock agreed to pay a share of royalties from those photographs to PMC, with guaranteed minimum payments made annually.  The arrangement worked reasonably well until mid-March 2020, when the coronavirus pandemic forced the mass cancellation of high-density live events of the type covered by the parties' agreement.  After unsuccessful negotiations to revise the deal terms to address the pandemic, and faced with the

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 1 of 26

elimination of nearly all revenue from the arrangement, Shutterstock gave notice that it believed PMC breached the contract by failing to provide access to live events and demanded "cure." PMC responded by suing Shutterstock in the Southern District of New York in June 2020 (the case was refiled in this Court after federal law claims were dismissed). Shutterstock thereafter terminated the agreement and refused in July 2020 to make a $3.5 million "advance" payment to cover the final year of the arrangement (through June 2021). It also counterclaimed for breach of contract and sought rescission of the agreement due to frustration of purpose.

PMC now moves for summary judgment on its breach of contract claim and to dismiss Shutterstock's counterclaims for breach of contract (in part), rescission due to frustration of purpose, and restitution after recission (Mot. Seq. 002). Shutterstock moves for partial summary judgment dismissing PMC's breach of contract claim and in its favor on its first counterclaim that PMC breached the parties' contract by not providing access to certain events (Mot. Seq. 003).

For the following reasons, PMC's motion for summary judgment dismissing in part Shutterstock's first counterclaim for breach of contract is granted; both parties' motions are otherwise denied.

## STATEMENT OF FACTS

PMC is a media company that owns, among other things, entertainment and fashion industry publications such as *Women's Wear Daily (WWD)*, *Variety*, *Billboard*, *The Hollywood Reporter*, and *Rolling Stone* (NYSCEF 192 [PMC's Response to Shutterstock's Counterstatement to PMC's Rule 19-a statement ("Counterstmt")] ¶96). For decades, PMC has consistently enjoyed exclusive access to attend and photograph high-profile entertainment and fashion industry events (Counterstmt ¶97). PMC also hosts and invites third parties to its own

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 2 of 26**

2 of 26

[* 2]

events, galas, conferences, summits, and other event functions (Counterstmt ¶98). These live events are part of PMC's core business (*see* NYSCEF 35 [Deposition Transcript of Jay Penske ("Penske Tr.")] at 21:18-20).

For years, PMC—through its publication *Variety*—had granted Getty Images the right to use its "golden pass" to attend and photograph third-party entertainment and fashion industry events (Counterstmt ¶99; NYSCEF 32 [Agreement between *Variety* and Getty Images]). However, by early 2015, a dispute arose between PMC and Getty Images (*see* NYSCEF 33 [Demand Letter to Getty Images dated July 27, 2015]; NYSCEF 34 [October 26, 2015 email from Mr. Penske]). PMC also owns a large and ever-growing photographic collection with millions of images related to its publications (NYSCEF 134 ["Rule 19a Stmt"] ¶2). PMC had recently acquired thousands of images in hard copy from its acquisitions of *Variety* and *WWD,* which it had not previously offered for license, and was interested in monetizing this content (Counterstmt ¶¶108, 115; NYSCEF 36 ["Grobar Tr."] at 292:5-18).

Shutterstock is a provider of high-quality photographs and other content (Counterstmt ¶89). In 2014, Shutterstock decided to launch an "editorial" product to capitalize on the growing demand for editorial photography and gain market share from Getty Images (Counterstmt ¶91). In early 2015, Shutterstock acquired Rex Features, the largest independently owned photographic press agency in Europe—securing significant event access in Europe—and identified PMC as its solution for obtaining event access in the United States (Counterstmt ¶¶93-95). Over the next two years, Shutterstock entered into multi-year agreements with various other entities in order to gain additional access and content for its Editorial product. Shutterstock's deals with two major news photographic agencies gave it access to roughly 4,500 fresh, newsworthy images each day (Counterstmt ¶94).

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 3 of 26**

3 of 26

*Archive & Event Image Hosting and Licensing Agreement*

On or about June 20, 2015, PMC and Shutterstock entered into an Archive & Event Image Hosting and Licensing Agreement (the "Agreement"), effective as of July 1, 2015, which provided for a six-year term that was to expire on June 30, 2021 (NYSCEF 38 ["Agrmt,"]; Rule 19a Stmt ¶¶6-7). The Agreement was part of Shutterstock's strategic plan to gain "credibility in the market for editorial content" and transform itself from a provider of low value stock photographs to a purveyor of prestigious news and editorial content (Rule 19a Stmt ¶¶23, 25).

Under the Agreement, PMC granted Shutterstock two sets of rights: (i) "an exclusive worldwide right" to exploit all of the content under the Agreement, including the "Archive Content," "PMC Event Content," and "Third Party Event Content"; and (ii) access for Shutterstock to photograph certain live events hosted by others ("Third Party Events") and by PMC ("PMC Events") (Agrmt §3[a]).

Under "Archive Content," the Agreement provides that "PMC and Shutterstock will work together in good faith in the creation, management, hosting, distribution and syndication of image, footage and/or audio content" currently owned or obtained by PMC during the Agreement, and provides that Shutterstock has the right to "upload and host PMC's Archive Content, including, but not limited to, the Fairchild, Variety, WWD, W, DNR, Deadline, Sportstyle, V-Life, FN, HollywoodLife, BGR, TVLine content libraries . . ." (Agrmt §3[a][i]).

Under "PMC Events and PMC Event Content," the Agreement provides:

> PMC will provide Shutterstock access to its events, galas, conferences, summits, and other event functions *to which third parties are invited generally* ("PMC Events"). All image, footage and/or audio content recorded at such PMC Events are referred to herein as "PMC Event Content". During the License Period, Shutterstock will provide editorial photographic event coverage, at Shutterstock's expense, for all PMC Events . . . . Shutterstock agrees that for all PMC Event Content

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 4 of 26**

[* 4]

distributed by Shutterstock or its subsidiaries, Shutterstock or its subsidiaries shall use all commercially reasonable efforts to promote such PMC Event Content in "featured" or "spotlight" emails or other distribution methods. In the event that any third party sponsors of PMC Events would like to license or otherwise use any PMC Event Content for commercial or advertising purposes (beyond such sponsors' use of PMC Event Content for PR, social media and other promotional purposes as part of such sponsor's sponsorship activation with PMC), Shutterstock and PMC agree to share in all gross revenues received by Shutterstock from the licensing or other monetization of such PMC Event Content, less any actual refunds, on a 50/50 basis.

(Agrmt § 3[a][ii] [emphasis added]). Under "Third Party Event Access and Third Party

Event Content," the Agreement provides:

PMC will provide to Shutterstock defined credentials, passes, and VIP access to significant events around the world *to which PMC has access* as defined herein ("Third Party Events"). All image, footage and/or audio content created hereunder at the Third Party Events is referred to herein as "Third Party Event Content". Subject to the Getty Agreement Restrictions, PMC hereby grants to Shutterstock the right to be the sole third party to leverage and utilize PMC's credentials and access to capture Third Party Event Content at Third Party Events. These Third Party Events shall initially include, but not be limited to, those events listed on Schedule "D". PMC shall work with Shutterstock in good faith to create additional access at third party events that will enable the Parties to further monetize the Third Party Event Content.

(Agrmt § 3[a][iii] [emphasis added]).

Schedule D lists twelve well-known "red carpet" entertainment events: the Golden Globes Awards and Nominee Press Conference, Sundance Film Festival, Grammy Awards, Academy Awards, Tony Awards, Emmy Awards, Cannes Film Festival, Screen Actors Guild Awards, Directors Guild of America Awards, Venice Film Festival, Independent Spirit Awards, and Toronto Film Festival (the "Schedule D Events") (*id.*).

Although Shutterstock initially drafted the Third Party and PMC Event provisions without the qualifying "to which" clauses (Rule 19a Stmt ¶36), PMC added those qualifications,

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 5 of 26

5 of 26

and Shutterstock accepted them (Rule 19a Stmt ¶36-37). Mr. Pfeifer, who negotiated the deal on behalf of Shutterstock, testified that he didn't recall having any discussion with PMC about that addition (Deposition Transcript of Benjamin Pfeifer ["Pfeifer Tr."] at 98:2-4) but that they "expected Variety to be able to get into any event of significance. In fact, Variety being at an event would make it significant" (Pfeifer Tr. at 98:11-18). When asked about the difference between the original language and PMC's addition, Mr. Pfeifer testified, "I don't know what their specific intent was. Reading this today, I understand it to be creating wiggle room in the event that they're blocked out of an event because of some third-party, say Getty, causing a problem for Variety getting access to an event, but we didn't contemplate that as a high risk" (Pfeifer Tr. at 98:19-25 – 99: 1-7). Mr. Pfeifer testified that "I understand that the language 'to which PMC has access' is a qualification, but I would add that we did not perceive this as business risk at the time." (Pfeifer Tr. at 100:5-9]).

Under the Agreement, Shutterstock agreed to pay royalties to PMC, with up-front advances against such royalties ("Advances") due at the start of each of the Agreement's six license periods ("License Periods") (*id.* §6). The Agreement provides:

> Royalties and Advances: Shutterstock shall pay PMC 30% of all gross revenue, less actual refunds, generated from Shutterstock's sale, distribution, syndication or other monetization of the Archive Content, PMC Event Content, and Third Party Event Content (the "PMC Royalties"). Shutterstock shall pay to PMC an annual fully recoupable advance against royalties (the "Royalty Advances") payable as follows:
>
> - Year 1: $1,500,000 due on or before September 1, 2015
> - Year 2: $1,500,000 due on or before July 1, 2016
> - Year 3: $2,000,000 due on or before July 1, 2017
> - Year 4: $2,500,000 due on or before July 1, 2018
> - Year 5: $3,000,000 due on or before July 1, 2019
> - Year 6: $3,500,000 due on or before July 1, 2020

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 6 of 26**

[* 6]

6 of 26

> The Royalty Advances shall be recoupable by Shutterstock solely from all PMC Royalties (as defined above) otherwise payable to PMC during the twelve month period of the License Period to which such Royalty Advance relates (i.e., the July 1 to June 30 period following payment) and any options or extensions thereto. . . .

(Agrmt. §6). PMC's negotiator testified that "the reason that we [PMC] did this was to make sure that when Shutterstock was able to recoup royalties, it was only in relation to the 12-month period" (NYSCEF 37 [Greene Tr.] at 231:6-11).

Further, Shutterstock agreed to provide PMC a $1 million credit per Period for licensing images on Shutterstock's platform (Agrmt. §2[a]; Counterstmt ¶123). Shutterstock agreed to provide "PMC an account with Shutterstock's cloud-based digital asset management service, WebDAM. During the License Period, such account will have the right to store up to 100 TBs of digital content at no cost to PMC" (Agrmt. §2[b]). The parties agreed that "[d]uring the License Period, Shutterstock will use all commercially reasonable efforts to assist PMC in transferring the Archive Content, any PMC Event Content and any Third Party Event Content to Shutterstock's WebDAM" (Agrmt. §4).

The Agreement contains a termination provision requiring written notice and a 45-day cure period before a party can terminate for cause (Rule 19a Stmt ¶21). It provides that "[e]ither Party may terminate the Agreement at any time for cause by giving the other Party written notice and providing for a forty-five (45) day period ("Cure Period") during which the other must correct, cure or otherwise resolve the alleged cause for termination. If at the conclusion of the Cure Period the cause for termination has not been corrected, cured or otherwise resolved then the non-breaching Party shall give written notice of termination to the other of not less than ten (10) business days." (Argmt. §8). During contract negotiations, Shutterstock requested the right

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
   Motion No.  002 003

Page 7 of 26

7 of 26

[* 7]

to terminate the Agreement if Shutterstock's revenues fell significantly below a prescribed level, but PMC rejected that term (Rule 19a Stmt ¶¶31-35).

A press release dated June 22, 2015 issued by the parties states that "[b]y combining Shutterstock's technology and innovative marketplace with PMC's insider access, journalism excellence and event exclusivity, both companies are taking a significant step together to build the world's best editorial service and to drive future growth" (NYSCEF 80). The Press Release lists "[h]ighlights of the strategic alliance" as follows:

- Commencing in 2016, Shutterstock will have an exclusive worldwide right and license to PMC's archive, including images from its legendary, 100-year-old publications Variety and WWD.
- At the more than 50 events, galas, summits and conferences PMC produces annually, Shutterstock will capture the unique moments, as well as market and license the imagery to the world's media.
- Leveraging PMC's insider access, Shutterstock will document leading Hollywood events which may include the Golden Globe Awards and the Academy Awards, as well as capture the latest fashion industry trends including global runway coverage and exclusive parties.
- PMC has chosen Shutterstock's digital asset management service, WebDAM, to support its editorial and creative teams' needs to store, organize and manage visual content on the leading cloud-based platform.

(*id.*).

In its Complaint, PMC cites an article about the deal between the parties that emphasizes that "Access is Everything" and that "[t]he production of editorial content is a heavily protected wall garden. Whether its celebrity, sports and some of the news, it is event-centric with very strict regulations on who can photograph them" (*see* Compl. ¶22 ["Shutterstock was finally able to "crack the barriers" and gain access through PMC that industry expert Paul Melcher coined Shutterstock's "golden pass.""]; NYSCEF 54 [Melcher article]).

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 8 of 26**

8 of 26

PMC's Chief Operating Officer, George Grobar, testified that "[t]he deal was built on the concept of they could leverage the access to these events. So I -- as well as the archives, which we had, and so I think that the fact that they would have expected these particular events to happen is not unreasonable" (NYSCEF 36 at 134:22-135:1-4). Todd Greene, a negotiator of the Agreement on behalf of PMC, testified that based on his understanding, Shutterstock was looking for a "media partner who could partner with them and help them gain entry into a market that they previously were not a party to . . . it was important to them that they enter into an agreement with somebody like PMC that could give them access to images to be captured for use in editorial -- for their editorial product" (NYSCEF 37 at 97:24-25 - 98: 2-3, 16-20).

Mr. Pfiefer, Shutterstock's lead negotiator, testified that "[i]n Rex Features we had entertainment, but UK and European focused. As we lined up deals with European Press PhotoAgency, AP and others, we were filling in different buckets. PMC for us was the solution for U.S. entertainment and fashion access and archive content" (Pfeifer Tr at 162:10-18). He further testified that as to event access was that "what we had learned in our diligence with acquiring Rex Features is that most of their revenue came from live events, not their archives, and Rex Features had a hard time getting credentials, in particular to U.S. fashion and entertainment events. So this part of the Deal Scope specifically to Shutterstock meant that, you know, Variety could get into any entertainment event it wanted to up until the point that we did this deal" (Pfeifer Tr at 53:15-25).

The record reflects that PMC had also recently acquired thousands of images in hard copy from its acquisitions of *Variety* and *WWD* (Counterstmt ¶108). In particular, PMC acquired the "Fairchild Archive" "which is the largest fashion archive of photographs" from Conde Nast and PMC "w[as] required to move certain assets off their platform or their offices" (Penske Tr. at

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 9 of 26**

9 of 26

[* 9]

493:21-25 – 440:1-3, 11-12).  PMC was "trying to do [their] first comprehensive deal" and avoid "disparate deals, one with Getty, one with Adobe, one with Corbis."  Mr. Penske testified that "[t]he idea was to try to do a single deal. So we were saying, hey, at this point, Jon, you know, we're looking for a comprehensive deal, and our timeline is tight as it relates to when we are required to move stuff off of the Conde Nast system" (*id.* at 440:8-20).

PMC was in the process of digitizing these photographs which was "a very, very complex project. We were dealing with millions of photographs that were physical assets that had to be touched by human hands and evaluated for appropriateness and trying to get the highest value" including determining whether Shutterstock could sell the images (NYSCEF 36 ["Grobar Tr."] at 292:5-18).  PMC testified that "[i]t's going to take a long time to get through that which Shutterstock was well aware of. They did not – they were supportive of our plan. They did help pay for the digitization because we were making progress." (Grobar Tr. at 292:22-25 – 293:1-2).

When asked about the language in the Agreement that Shutterstock proposed which provided for Shutterstock partially reimbursing PMC's expenses arising from PMC's obligation to make the archive images SSTK-compliant, Mr. Pfeifer testified that "[w]hat I recall is that by this point the Shutterstock content team had been exploring ways to speed digitization and metadata creation of archival content. I remember us looking at the Rex Features archive content and then having conversations with Jay [Penske] about the state of his archives, which were similar or worse than Rex Features. And we offered assistance in finding vendors that could help digitize, scan and accelerate the process of making the archival content commercially, you know, monetizable" (Pfeifer Tr at 79:10-25 – 80:1-8).

Jon Oringer, Shutterstock's founder and former CEO, testified that they tried to do due diligence on the archive, but "a lot of what we got back was that it wasn't fully digitized, so it

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 10 of 26

was hard to full- -- really understand what it was. So we had to go in blind on a couple of these details" (NYSCEF 164 ["Oringer Tr."] at 102:23-25 – 103:1-2) but that "[w]e had every expectation that this would be something successful, yes. We -- we wanted the archive to be successful" (Oringer Tr. at 104:9-11).

### *Performance Under the Agreement*

Shortly after signing the Agreement, PMC began providing Shutterstock with access to Events (Counterstmt ¶125). In each of the first four License Periods, Shutterstock used PMC's credentials to attend hundreds of Events. It is undisputed that PMC provided no Archive Content until fourteen months into the Agreement (Counterstmt ¶126).

Shutterstock timely paid the first four Advances (Counterstmt ¶127). Shutterstock also timely paid the fifth Advance for $3 million, which was fully recoupable against royalties due to PMC from revenue generated from July 1, 2019 through June 30, 2020 ("Fifth Period") (Counterstmt ¶128). That revenue was expected to come primarily from Third Party Event Content, which together with PMC Event Content had accounted for approximately 90% (or more) of the revenue generated under the Agreement from 2015 to 2019 (Counterstmt ¶118; 129).[1] It is undisputed that Shutterstock's expenses under the Agreement exceeded its net revenues for each License Period (NYSCEF 70 at 21; NYSCEF 133 at 21).

### *The Covid-19 Pandemic*

In mid-March 2020, with a few months of the Fifth License Period remaining, virtually all live events were cancelled due to the COVID-19 pandemic (Counterstmt ¶139). All of the

---

[1] As to 2020, Shutterstock testified that "the archive sales percentage did shift from around 9 percent, as I mentioned earlier, to 30. A big piece of that was that one large deal with Kiehl's" (NYSCEF 165 ["Murray Tr."] 605:10-16).

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**                   **Page 11 of 26**
  **Motion No.  002 003**

11 of 26

Live Events listed in Schedule D that had been scheduled to occur between July 1, 2020 and June 30, 2021 were cancelled, postponed, or held in a substantially altered manner that undermined their value for purposes of the Agreement (Counterstmt ¶141). From then on, PMC did not provide Shutterstock with access to any Events (Counterstmt ¶¶140-141). Shutterstock's revenue under the Agreement dropped to "almost nothing" (Counterstmt ¶142).

In late March 2020, Shutterstock approached PMC in an effort to amend the Agreement to account for the pandemic's impact on Events (Counterstmt ¶145). Shutterstock proposed an adjusted Advance and offered to pay PMC a higher percentage of the licensing revenue (Counterstmt ¶¶ 72, 74). In response, PMC proposed that the parties extend the term for an additional year with Shutterstock paying the corresponding $3.5 million Advance in two installments, and that Shutterstock give PMC an additional $1 million credit for licensing images on Shutterstock's website in exchange for the deferral (Rule 19a Stmt ¶76; Counterstmt ¶147). The respective proposals were not accepted.

On May 18, 2020, Shutterstock sent a "Cure Notice" to PMC under Section 8 of the Agreement, citing PMC's purported breach of the Agreement for failing to provide access to Events. PMC did not respond. Instead, on June 15, 2020, PMC filed an action against Shutterstock in federal court (*Penske Media Corp. v Shutterstock, Inc.*, No. 1:20-CV- 04583 (MKV) (SDNY) (the "Federal Action") (Counterstmt ¶¶156-157). On July 2, 2020, Shutterstock confirmed its termination of the Agreement (Counterstmt ¶158).

## PROCEDURAL HISTORY

In the Federal Action, PMC alleged that Shutterstock terminated the Agreement without cause, and thereafter refused to pay royalties and advances as set forth in the Agreement, and also brought claims for breach of the implied covenant, and copyright-related claims (*see Penske*

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 12 of 26**

12 of 26

*Media Corp. v Shutterstock, Inc.*, 548 F Supp 3d 370 [SDNY 2021]).  After the court denied a motion to dismiss, the parties "voluntarily dismiss[ed] of all federal claims and counterclaims upon which federal jurisdiction was based" (*Penske Media Corp. v Shutterstock, Inc.*, 2024 WL 1313356, at *1 [SDNY Mar. 27, 2024]). The court declined to assert supplemental jurisdiction with respect to the remaining state law claims and dismissed the action for lack of subject matter jurisdiction (*id.*).

On May 29, 2024, PMC refiled its lawsuit in this Court, asserting a single claim for breach of contract on the ground that "Shutterstock had no valid basis to terminate" the Agreement and "fail[ed] to pay" the Advance and provide the licensing credit for the Period starting July 1, 2020 (NYSCEF 1 ¶¶ 40-41). On June 24, 2024, Shutterstock asserted, *inter alia*, a counterclaim for breach of contract based on PMC's purported breaches of the Agreement, including failure to provide access to Events starting in March 2020 (NYSCEF 5 ¶¶59-64).

PMC now seeks summary judgment on its First Claim for Breach of Contract and on Defendant's First Counterclaim for Breach of Contract (insofar as it relates to PMC's purported failure to provide Shutterstock access to cancelled Schedule D Events), Second Counterclaim for Rescission Under Frustration of Purpose Doctrine, and Third Counterclaim for Restitution After Rescission.  Defendant moves for summary judgment on its First Counterclaim for Breach of Contract and on Plaintiff's Claim for Breach of Contract.

## DISCUSSION

Under CPLR 3212, "[s]ummary judgment must be granted if the proponent makes 'a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact,' and the opponent fails to rebut that showing" (*Brandy B. v Eden Cent. School Dist.*, 15 NY3d 297, 302 [2010]).

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
Motion No.  002 003

**Page 13 of 26**

[* 13]

13 of 26

### A. Breach of Contract Claims (Plaintiff's First Claim and Defendant's First Counterclaim)

As discussed above, each party sues the other for breach of contract. PMC alleges that Shutterstock breached the Agreement by "improperly purport[ing] to terminate the Archive & Event Agreement as of no later than July 17, 2020" and "by failing to pay the $3.5 million non-refundable advance due and owing prior to July 17, 2020" (Compl. ¶¶40-41). In response, Shutterstock's first counterclaim alleges that "[t]o the extent the purposes of the Contract were not frustrated prior to termination" PMC breached the Agreement by, among other things, failing to perform under the Agreement and breaching its representation "that it would supply credentials, passes and VIP access to at least the events identified in Schedule D" (NYSCEF 6 ["CC"] ¶62).

Section 8 of the Agreement provides that "[e]ither Party may terminate the Agreement at any time *for cause* by giving the other Party written notice and providing for a forty-five (45) day period ("Cure Period") during which the other must correct, cure or otherwise resolve the alleged cause for termination. If at the conclusion of the Cure Period the cause for termination has not been corrected, cured or otherwise resolved then the *non-breaching Party* shall give written notice of termination to the other of not less than ten (10) business days." (NYSCEF 38 §8 [emphasis added]). The language of this section indicates that a breach of the Agreement constitutes a "for cause" event. Thus, the first issue is whether there was a breach by PMC that allowed Shutterstock to terminate the Agreement.

Beginning with Shutterstock's counterclaim, the dispute boils down to whether PMC was—as Shutterstock contends—unconditionally obligated under the Agreement to provide Shutterstock with access to the specified Schedule D Events, regardless of whether those Events actually took place. The Court finds that the contract language does not support Shutterstock's

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 14 of 26**

14 of 26

strained reading. Although the Agreement provides that PMC "will provide Shutterstock access" to various Third Party and PMC Events, it also expressly limits that obligation to events "to which PMC has access" (Third Party Events) or those "to which third parties are invited generally" (PMC Events). Here, it is undisputed that the Third Party Events were cancelled. Accordingly, they were not events "to which PMC [had] access."

Shutterstock's contention that Schedule D of the Agreement (listing certain Third Party Events) overrides the contractual definition—and essentially shifts the risk to PMC if an Event does not take place—is unavailing. The provision on which Shutterstock relies provides that "[t]hese Third Party Events shall initially include, but not be limited to, those events listed on Schedule 'D.'" While it would have been possible for parties to shift the contractual/financial risk of Event cancellation solely to PMC, this language does not do so. It is, read naturally, simply an "initial" list of Events to which PMC had access in 2015 when the Agreement was signed, and there is no dispute as to its accuracy. The inclusion of the word "initially" indicates that the list was subject to change. Crucially, what is missing is any language indicating that Schedule D creates an unconditional obligation upon PMC to ensure access to all such Events— even if they are cancelled—at pain of breach of contract damages and/or termination for cause. Courts are "extremely reluctant to interpret an agreement as impliedly stating something"—here, guaranteeing events would occur—"which the parties have neglected to specifically include" (*Vermont Teddy Bear Co., Inc. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]). [2]

---

[2] Although the Court finds no ambiguity requiring resort to extrinsic evidence, it notes that the only moderately persuasive contemporaneous evidence offered on the motions supports PMC's position. Specifically, PMC insisted upon (and Shutterstock agreed) adding the "to which" language upon which the Court has relied, reflecting its importance to understanding the scope of PMC's obligations.

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No. 002 003**

**Page 15 of 26**

15 of 26

Accordingly, the Court finds that PMC did not breach the Agreement by "failing" to provide access to Events because there is no evidence that PMC denied Shutterstock to any Events (Schedule D or otherwise) *to which PMC had access*. Therefore, Shutterstock's first counterclaim for breach of contract must be dismissed to the extent it relies on these arguments.[3] The Court has considered Shutterstock's other arguments in opposition to summary judgment on this counterclaim and finds them unavailing.

This also dispenses with one of Shutterstock's grounds for terminating the Agreement for cause and failing to make the otherwise required $3.5 million payment in July 2020—namely, that PMC breached the Agreement by failing to provide access to Events. However, as discussed below, questions remain as to whether PMC is entitled to summary judgment on its affirmative claim against Shutterstock for breach of contract in view of Shutterstock's affirmative defense of frustration of purpose.

### B. *Frustration of Purpose*

"In order to invoke the doctrine of frustration of purpose, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense" (*Ctr. for Specialty Care, Inc. v CSC Acquisition I, LLC*, 185 AD3d 34, 42 [1st Dept 2020]; *Jack Kelly Partners LLC v Zegelstein*, 140 AD3d 79, 85 [1st Dept 2016]). The doctrine is described in Restatement (Second) of Contracts as follows: "[w]here, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the

---

[3] It is unclear what, if anything, remains of Shutterstock's first counterclaim after dismissing its Schedule D-related claims. However, since Plaintiff only moved for partial summary judgment on that counterclaim, it will not be dismissed in full at this time.

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 16 of 26**

16 of 26

contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary" (Restatement (Second) of Contracts § 265 [1981]). Frustration of purpose "focuses on events which materially affect the consideration received by one party for his performance. Both parties can perform but, as a result of unforeseeable events, performance by party X would no longer give party Y what induced him to make the bargain in the first place" (*United States v Gen. Douglas MacArthur Senior Vil., Inc.*, 508 F2d 377, 381 [2d Cir 1974]). "The doctrine of frustration of purpose does not apply unless the frustration is substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss" (*Rockland Dev. Assoc. v Richlou Auto Body, Inc.*, 173 AD2d 690, 691 [2d Dept 1991]).

As this Court observed in another pandemic-related contract action, the frustration of purpose doctrine "has its origin in what are known as the coronation cases" in which "defendant was excused from his duty of payment for use of the plaintiff's apartment along the route of the coronation procession, when the procession was cancelled because the King became ill" (*A/R Retail LLC v Hugo Boss Retail, Inc.*, 72 Misc 3d 627 [Sup Ct, NY County 2021], referring to *Krell v Henry* [1903] 2 KB 740 [Eng.]). More recently, the defense rose to the forefront in a number of pandemic-era commercial landlord-tenant lease disputes. As discussed *infra*, New York courts generally "rejected frustration of purpose, impossibility of performance, and failure of consideration as defenses to the nonpayment of rent under a commercial lease as a result of the pandemic" (*841-853 Fee Owner, LLC v Space Initiatives LLC*, 227 AD3d 434, 435 [1st Dept 2024], *lv to appeal dismissed,* 42 NY3d 981 [2024], *rearg denied,* 43 NY3d 937 [2025]; *see also Pentagon Fed. Credit Union v Popovic*, 217 AD3d 480, 481 [1st Dept 2023]; *Knickerbocker Retail LLC v Bruckner Forever Young Social Adult Day Care Inc.*, 204 AD3d 536, 537 [1st Dept

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 17 of 26

17 of 26

2022]; *City Natl. Bank v Baby Blue Distributions, Inc.*, 199 AD3d 559 [1st Dept 2021]; *558 Seventh Ave. Corp. v Times Sq. Photo Inc.*, 194 AD3d 536 [1st Dept 2022]). However, given the unique nature of the facts in this case, the Court finds that application of the frustration of purpose doctrine may—depending on the resolution of disputed facts—discharge Shutterstock's remaining duties to render performance (including payment of the 2020-2021 Advance) under the Agreement.

First, it is undisputed that a supervening event, not in existence at the time the parties entered the Agreement, occurred through no fault of either party: the Covid-19 pandemic and resulting cancellation of Events, including Schedule D Events. Second, it is undisputed that both PMC and Shutterstock expected live, in-person events to occur under the Agreement and for PMC to provide Shutterstock with access to those events. That was a basic assumption on which the contract was made. Moreover, while the Court has determined that PMC was not contractually obligated to provide access to the cancelled Schedule D Events, the inclusion of those Schedule D Events in the Agreement indicates that, at the very least, the parties expected those events to occur. Shutterstock's position that it would not have entered into the Agreement with PMC but for the opportunity to get exclusive access to Events, and that was its principal purpose in entering into the Agreement is supported by the record.

For example, in a deposition, PMC's COO, George Grobar, admitted that "[t]he deal was built on the concept of they could leverage the access to these events. So I -- as well as the archives, which we had, and so I think that the fact that they would have expected these particular events to happen is not unreasonable" (NYSCEF 36 at 134:22-135:1-4). Todd Greene, a negotiator of the Agreement on behalf of PMC, testified that based on his understanding, Shutterstock was looking for a "media partner who could partner with them and help them gain

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 18 of 26**

18 of 26

entry into a market that they previously were not a party to . . . it was important to them that they enter into an agreement with somebody like PMC that could give them access to images to be captured for use in editorial -- for their editorial product" (NYSCEF 37 at 97:24-25 - 98: 2-3, 16-20).  In its own Complaint, PMC cites an article about the deal between the parties that emphasizes that "Access is Everything" and that "[t]he production of editorial content is a heavily protected wall garden. Whether its celebrity, sports and some of the news, it is event-centric with very strict regulations on who can photograph them" (*see* Compl. ¶22 ["Shutterstock was finally able to "crack the barriers" and gain access through PMC that industry expert Paul Melcher coined Shutterstock's "golden pass."]; NYSCEF 54 [Melcher article]).  Indeed, the press release issued by the parties states, "[b]y combining Shutterstock's technology and innovative marketplace with *PMC's insider access*, journalism excellence and *event exclusivity*, both companies are taking a significant step together to build the world's best editorial service and to drive future growth" (NYSCEF 80 [emphasis added]).

And it is undisputed that as of March 2020, PMC ceased supplying access to any live events.  Further, there is evidence that all of the Live Events listed in Schedule D that had been scheduled to occur between July 1, 2020 and June 30, 2021 were cancelled, postponed, or held in a substantially altered manner that undermined their value for purposes of the Agreement (Counterstmt ¶141).  The lack of access to events meant that Shutterstock could not attend those events to photograph—the very reason Shutterstock entered into this Agreement.  And while Shutterstock's performance under the Agreement—the advancement of royalties—was not rendered impossible, its reason for doing so is arguably frustrated and rendered the transaction one "that would have made little sense" going forward (*Ctr. for Specialty* Care, 185 AD3d at 42).  In other words, there is a viable argument that performance by PMC could no longer give

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 19 of 26

19 of 26

Shutterstock what induced it to make the bargain in the first place (*MacArthur Senior Vil., Inc.*, 508 F2d at 381).

PMC argues that the principal purpose of the agreement was not destroyed because nothing about the pandemic diminished Shutterstock's rights or expectations related to the Archive side of the Agreement. However, there is evidence in the record indicating that PMC did not deliver any Archive Content to Shutterstock until fourteen months into the Agreement after Shutterstock had already paid two Advances (Counterstmt ¶126), and that the Archive Content accounted for only around 10% (or less) of the revenue generated under the Agreement from 2015 to 2019 (*id.* ¶118). In those circumstances, PMC has not conclusively negated Shutterstock's defense of frustration of purpose as a matter of law.

Further, there is evidence that inclusion of the Archive Content was more a benefit to PMC, who had to move a recently-acquired archive of photographs from Conde Nast's platform and offices and was looking to have a comprehensive deal with Shutterstock who could host its digital archive and help monetize the images (Penske Tr. at 493:21-25 – 440:1-20 ["[t]he idea was to try to do a single deal. So we were saying, hey, at this point, Jon, you know, we're looking for a comprehensive deal, and our timeline is tight as it relates to when we are required to move stuff off of the Conde Nast system"]). Much of what PMC acquired was in hard copy and needed to be digitized which PMC testified was "a very, very complex project. We were dealing with millions of photographs that were physical assets that had to be touched by human hands and evaluated for appropriateness and trying to get the highest value" including determining whether Shutterstock could sell the images (Grobar Tr. at 292:5-18). PMC testified that "It's going to take a long time to get through that which Shutterstock was well aware of. They did not – they were supportive of our plan. They did help pay for the digitization because we were

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 20 of 26**

making progress." (Grobar Tr. at 292:22-25 – 293:1-2).   Oringer, Shutterstock's founder and former CEO, testified that they tried to do due diligence on the archive, but "a lot of what we got back was that it wasn't fully digitized, so it was hard to full- -- really understand what it was. So we had to go in blind on a couple of these details" (Oringer Tr. at 102:23-25 – 103:1-2) but that "[w]e had every expectation that this would be something successful, yes. We -- we wanted the archive to be successful" (Oringer Tr. at 104:9-11).  This evidence further undermines PMC's motion for summary judgment.

The pandemic-era landlord-tenant cases on which PMC relies are distinguishable. The majority, if not all, of those cases rejected the frustration of purpose defense based on the fact that the "parties' respective duties were to pay rent in exchange for occupying the leased premises"—duties that were not substantially frustrated by the tenant's inability to use the space as intended for a couple of months during a multi-year lease (*Valentino U.S.A., Inc. v 693 Fifth Owner LLC*, 203 AD3d 480 [1st Dept 2022] ["Contrary to plaintiff's contention, frustration of purpose is not implicated by temporary governmental restrictions on in-person operations, as the parties' respective duties were to pay rent in exchange for occupying the leased premises, and plaintiff acknowledged that it was open for curbside retail services as of June 4, 2020 and services by appointment as of June 22, 2020"]).  Thus, the courts found that the party relying on the doctrine (*i.e.*, the tenant) largely obtained the principal purpose (*i.e.*, access to the property for business operations), and was only temporarily inconvenienced and/or experienced only a partial and transitory reduction in sales.  In contrast, assuming Shutterstock can persuade a finder of fact, there is evidence that Shutterstock reasonably expected that it would receive essentially none of the benefit that formed the principal purpose of the Agreement.

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 21 of 26

Moreover, in many of the landlord/tenant cases the parties had expressly contemplated the possibility of a government shutdown on their respective contractual obligations. The force majeure provisions in commercial leases, which "delineate *ex ante* which disruptions will excuse which obligations," precluded parties from arguing that the event which prevented performance was unforeseeable and required that the court hold the parties to the allocation of risk agreed on in the contract (*see A/R Retail LLC*, 72 Misc 3d 627; *see also Zero Carbon Holdings, LLC v Aspiration Partners, Inc.*, 732 F Supp 3d 326, 363 [SDNY 2024] ["The doctrine of frustration of purpose does not relieve Plaintiffs of their obligations or deny Defendant the benefit of the contracted-for remedy if Plaintiffs failed to meet those obligations"] [applying New York law]). In contrast, the Agreement here does not contain any provision contemplating or allocating risk if essentially all Events—including those in Schedule D—were cancelled. Nor is there any evidence that the parties ever discussed the possibility that Third Party Events would be cancelled by circumstances outside the parties' control.

PMC also argues that the purpose of the Agreement was only "partially frustrated" because Shutterstock had already received the benefits of the Agreement from July 2019 to March 2020, and because Shutterstock continues to enjoy such benefits. This argument too is unpersuasive. First, PMC's reliance on pandemic-era cases (*see Durst Pyramid LLC v Silver Cinemas Acquisition Co.*, 2022 NY Slip Op 31958[U], 7 [Sup Ct, NY County 2022], *affd*, 2023 NY Slip Op 06311 [1st Dept 2023]) that involved long-term leases with many years left is misplaced. In those cases, the length of the lease *going forward* went to whether there was "total or substantial frustration." So, for example, courts found that an interruption of business for a couple of months in a ten or twenty year lease cannot be said to have totally or substantially frustrated the lease, particularly where the circumstances had improved over time to permit

**652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 22 of 26**

business to proceed in alternative ways (*Gap, Inc. v 170 Broadway Retail Owner, LLC*, 195 AD3d 575, 577 [1st Dept 2021] [rejecting plaintiff's argument that "Executive Order 202.8 rendered it objectively impossible to perform its operations as a retail store" because "by the time plaintiff filed its complaint in July 2020, this was no longer the case"]). Here, by contrast, the Agreement had only a year remaining and it was subject to a separate $3.5 million guaranteed royalty payment for which – Shutterstock contends, with some evidentiary support – no value was expected. In contrast to the ability of certain commercial tenants (restaurants, retail stores, etc.) to continue their businesses despite pandemic-related restrictions on indoor gathering, Shutterstock has a viable contention that there was no "virtual" way to capture photographs of live events that did not occur.

The Restatement provides that where there is a frustration of purpose, the party's "remaining duties to render performance are discharged" (Restatement (Second) of Contracts § 265 [1981]). Illustration 3 to the Restatement is analogous here: "A, who owns a hotel, and B, who owns a country club, make a contract under which A is to pay $1,000 a month and B is to make the club's membership privileges available to the guests in A's hotel free of charge to them. A's building is destroyed by fire without his fault, and A is unable to remain in the hotel business. A refuses to make further monthly payments. A's duty to make monthly payments is discharged, and A is not liable to B for breach of contract" (Restatement (Second) of Contracts § 265 (1981), Illustration 3). As this Illustration demonstrates, A's continuing performance was not impossible, A could have continued to make monthly payments to B. However, A's purpose in agreeing to make monthly payments was frustrated and the agreement no longer made sense going forward.

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 23 of 26

In this case, Shutterstock had agreed to pay PMC a large, up-front "annual fully recoupable advance" against such royalties at the start of each of the Agreement's six successive, one-year License Periods. Each Advance was "fully recoupable" by Shutterstock, but "solely" from the royalties generated and due to PMC "during the twelve month period of the License Period to which such Advance relates." (Agmt. § 6; NYSCEF 37 [Greene Tr.] at 231:6-11 ["the reason that we did this was to make sure that when Shutterstock was able to recoup royalties, it was only in relation to the 12-month period"]). Thus, under the Agreement, Shutterstock has a viable argument that each License Period stands on its own. And at the time the payment was due, none of these Events were happening. Unlike the pandemic-era lease cases, this case does not involve the prospect of terminating payment obligations for years of rent going forward, but rather only one annual (and final) payment. Moreover, deriving some nominal value under the Agreement during the pandemic does not conclusively foreclose the defense here because, as noted, the question is whether this unforeseen event "substantially frustrated" Shutterstock's "principal purpose" in entering the Agreement.

Finally, PMC argues that the pandemic caused Shutterstock no real financial harm under the Agreement because Shutterstock had already lost money on the deal. It is undisputed that the expenses under the Agreement exceeded the net revenues each Period. However, as Shutterstock points out, it never argued that it withheld the final Advance because it expected a specific profit. Rather, Shutterstock contends that it was focused on the fact that the value of Shutterstock's *brand* continued to grow through continued access to marquis Events. Indeed, this highlights the contrast between this case and the cases cited by PMC. For example, in *A/R Retail LLC v Hugo Boss Retail, Inc.*, (72 Misc 3d 627, 645 [Sup Ct, NY County 2021]), this Court noted that the tenant acknowledged that the Hugo Boss retail location generated financial losses even before

**652761/2024  PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.**
**Motion No.  002 003**

**Page 24 of 26**

[* 24]

the pandemic, and the tenant's senior executive's statement that part of the store's purpose was to promote "visib[ility]" demonstrated that that purpose was "not frustrated by the dissipating capacity restrictions." Here, Shutterstock has a triable position that the central contractual purpose of access to high profile events *was* frustrated by the Covid-19 pandemic in that all the events envisioned by the parties' Agreement were cancelled.

Accordingly, based on these particular facts, the Court finds that Shutterstock has raised issues of fact as to whether further performance by Shutterstock under the parties' Agreement after March 2020 was excused by frustration of purpose. Therefore, both parties' motions for summary judgment are denied on PMC's breach of contract claim.

For the same reasons, the Court also finds that fact issues preclude summary judgment in PMC's favor on Shutterstock's counterclaims for rescission and restitution based on frustration of purpose.

Accordingly, it is

**ORDERED** that Plaintiff's motion for Summary Judgment (Mot. Seq. 002) is **GRANTED** insofar as Shutterstock's first counterclaim against PMC for breach of contract is dismissed in part, as described above; Plaintiff's motion is otherwise **DENIED**; it is further

**ORDERED** that Defendant's motion for Partial Summary Judgment (Mot. Seq. 003) is **DENIED**; it is further

**ORDERED** that the parties shall appear for a virtual initial pre-trial conference on May 29, 2025 at 10:00 AM to discuss trial scheduling and logistics; the parties are directed to meet and confer prior to the conference to discuss the proposed length of trial and any other logistical issues that they have identified and be prepared to discuss those at the conference.

This constitutes the Decision and Order of the Court.

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.
Motion No.  002 003

Page 25 of 26

25 of 26

[* 26]

2025051516181914MCOHEN69918F45C5EA413EA1225B9E80E54D53

| 5/15/2025 | | JOEL M. COHEN, J.S.C. |
| DATE | | |

**CHECK ONE:**

| | CASE DISPOSED | | X | NON-FINAL DISPOSITION | | |
| | GRANTED | DENIED | X | GRANTED IN PART | | OTHER |

**APPLICATION:**    SETTLE ORDER    SUBMIT ORDER

**CHECK IF APPROPRIATE:**    INCLUDES TRANSFER/REASSIGN    FIDUCIARY APPOINTMENT    REFERENCE

652761/2024   PENSKE MEDIA CORPORATION vs. SHUTTERSTOCK, INC.          Page 26 of 26
Motion No.  002 003

26 of 26